# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

HOWARD A. ALLEN, JR.        )
                                 )
            Petitioner,     )
    vs.                           )       1:01-cv-1658-JDT-TAB
                                 )
BILL WILSON, Superintendent[1],    )
                                 )
           Respondent.   )

## Entry After Hearing Directed by Remand

Petitioner Howard A. Allen, Jr. ("Allen") sought habeas corpus relief pursuant to 28 U.S.C. § 2254(a). This court denied that petition and Allen appealed. On March 11, 2009, the Seventh Circuit Court of Appeals vacated the denial of Allen's petition for writ of habeas corpus and remanded the case "for an evidentiary hearing to address whether Allen is mentally retarded under Indiana law. *Allen v. Buss*, 558 F.3d 657, 659 (7th Cir. 2009). The Seventh Circuit explained that "the Indiana Supreme Court['s] determin[ation] that because Allen had already litigated his claim that he was mentally retarded as a mitigating circumstance, he would not be allowed to relitigate his *Atkins* claim . . . is contrary to the Supreme Court's holding in *Atkins.*" *Id.*

An evidentiary hearing was conducted on July 19-21, 2010. The parties presented

---

[1] The petitioner's custodian, named in his official capacity only, is **substituted** as the sole and proper respondent in this action.

evidence and arguments as to whether Allen is mentally retarded as defined under IND. CODE § 35-36-9-2 and as to whether petitioner is entitled to relief under *Atkins v. Virginia*, 536 U.S. 304 (2002), which prohibits the execution of mentally retarded persons as cruel and unusual punishment. The parties participated through their counsel of record. The parties also presented arguments through hearing briefs and post-hearing supplemental briefs.[2]

As explained by the Supreme Court, "clinical definitions of mental retardation require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care and self-direction that became manifest before age 18." *Atkins* at 318. For the reasons explained in this Entry, the court concludes that Allen is mentally retarded as defined under Indiana law and that Allen is entitled to relief under *Atkins*.

## I. References and Clinical Definitions

As used in this Entry, "Dr. Heilbronner" refers to psychologist Dr. Robert Heilbronner, Ph.D., "Dr. Keyes" refers to psychologist Dr. Denis Keyes, Ph.D., "Dr. Swanson" refers to psychologist Dr. Victoria Swanson, Ph.D., "Dr. Hazelrigg" refers to psychologist Dr. Mark Hazelrigg, Ph.D., "Dr. Dare" refers to Special Education Administrator Dr. Mary Jo Dare, "Stokes" refers to Howard Allen's younger sister, Marilyn Stokes, "Michael Allen" refers to Allen's younger brother Stephen Michael Allen, and "IPS" refers to the Indianapolis Public Schools.

---

[2] Counsel for both the petitioner and respondent are to be complimented for their thorough preparation for the hearing and for their helpful briefs and arguments.

Criteria used by mental health professionals in making an intellectual disability assessment include the American Association of Intellectual and Developmental Disabilities ("AAIDD") *Intellectual Disability, Definition, Classification and Systems of Supports, Eleventh Edition* (2010) ("Green Book"), the American Psychiatric Association ("APA") *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revised* (2000)("DSM"), and the *Division of Intellectual Disabilities* ("Division 33") requirements.

The *Green Book* explains the AAIDD's "commitment to disseminating to the field of intellectual disability information and best practice guidelines regarding the diagnosis, classification, and planning of individualized supports to people with ID." *Green Book*, at xiv.

The *Green Book* defines *intellectual disability* as "characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social and practical adaptive skills. This disability originates before age 18." *Id.* at 6. Furthermore,

The following five assumptions are essential to the application of this definition:

1. Limitations in present functioning must be considered within the context of community environments typical of the individual's age peers and culture.

2. Valid assessment considers cultural and linguistic diversity as well as differences in communication, sensory, motor, and behavioral factors.

3. Within an individual, limitations often coexist with strengths.

4. An important purpose of describing limitations is to develop a profile of needed supports.

5. With appropriate personalized supports over a sustained period, the life functioning of the person with intellectual disability generally will improve.

*Id.* at 1. The *Green Book* defines *intelligence* as "a general mental ability. It includes reasoning, planning, solving problems, thinking abstractly, comprehending complex ideas, learning quickly, and learning from experience. *Id.* at 15 (citation omitted). The *Green Book* defines *adaptive behavior* as "the collection of conceptual, social and practical skills that have been learned and are performed by people in their everyday lives. *Id.* And, of course, the *Green Book* draws heavily from the DSM, which defines mental retardation as follows:

The essential feature of mental retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self direction, functional skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C). Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system.

*DSM,* at p. 41.

## II.  Background

Allen is on Indiana's death row. He was eligible for imposition of the death penalty because he intentionally killed in the course of a robbery. The details of his crime, prosecution and the aftermath are well chronicled in the remanding opinion cited above and in the Indiana cases referred to therein as *Allen I, II* and *III*, so they will not be repeated here. After Allen was denied relief in the Indiana state courts, he filed this action seeking a writ of habeas corpus. His petition was denied on September 19, 2006. This court granted Allen's petition for a certificate of appealability as to whether Allen is mentally retarded under *Atkins*.

The Seventh Circuit remanded Allen's case for the court to determine whether Allen is mentally retarded under Indiana law. That step has now been taken. Through this Entry, the question posed through the remand are answered. The evidentiary hearing included consideration of the reports and testimony of Dr. Swanson and Dr. Hazelrigg, the depositions of Dr. Keyes and Dr. Heilbronner and the testimony of Dr. Dare, Stokes and Michael Allen. Also considered were the pre-hearing briefs, the post-hearing supplemental briefs submitted by the parties and the expanded record of proceedings in the Indiana state courts.

## III.  Issue

*Atkins* holds that a person who is mentally retarded may not be executed. The Indiana Supreme Court had held that because Allen had already litigated his mental

retardation claim as a mitigating circumstance, he could not relitigate his *Atkins* claim. The Court of Appeals rejected this as contrary to the holding in *Atkins*. The Court of Appeals noted that under *Atkins*, "there is a difference between using mental retardation as a mitigating factor and categorically excluding mentally retarded persons from the death penalty altogether." *Allen v. Buss,* 558 F.3d at 659. The Seventh Circuit then explained that on remand this court

> should give Allen the chance to develop the factual basis of his claim and present it at an evidentiary hearing. The court must then determine, using Indiana's standard for mental retardation, whether Allen is entitled to relief under *Atkins.*

*Allen,* 558 F.3d at 665.

### IV. Evidence

The court reviewed the materials filed or produced in the case, including transcripts of Dr. Heilbronner and Dr. Keyes' deposition, briefs, a summary of adaptive assessments prepared by Dr. Swanson, a forensic psychological case analysis prepared by Dr. Hazelrigg, Allen's school and social security records, an employment application, post-conviction testimony of Robert Maul and attorneys Brett Westerfeld and Reginald Bishop, trial testimony of Detective Crooke and Allen's sister, April Allen, excerpts from the direct appeal record and supplemental record including pre-sentence investigation reports, Allen's pro se motion to correct errors, testimony about a polygraph, testimony from Don

Wright, Douglas Buck and Allen, affidavits from Dr. Dare, Richard Dever, Gwendolyn Allen, Michael Allen, Ruby Allen, Charles Smith and Allen himself, excerpts from the appeal from the denial of state post-conviction relief including testimony of Darla Allen, Stokes, Rhonda Allen, Travis Crowe, Robert Maul, James Shropshire, Marjorie Hammock, Dr. Heilbronner, Department of Correction records, Alex Voils' deposition, school records for Stokes, April, Gwendolyn and Eleanor Allen, Allen's request for an interview, excerpts from the direct appeal briefs, and excerpts from Allen's brief and reply brief from the denial of state post-conviction relief. The court also reviewed evidence presented at the evidentiary hearing, including the exhibits and a transcript of the live testimony from Dr. Dare, Stokes, Michael Allen, Dr. Swanson and Dr. Hazelrigg. The court will provide a description of the IQ and adaptive functioning tests administered, arguments made and testimony of the experts as to the validity of those tests and relevant portions of the testimony of Dr. Dare, Stokes, and Michael Allen.

### A. IPS Testing

In arguing that Allen manifests significantly subaverage intellectual functioning, Allen relies on two IQ tests administered while he was a student in IPS. Both tests given to Allen were the Revised Stanford Binet Intelligence Scale, Form L. Both were individually administered tests. The first test was administered in 1956 and the second test was administered in 1959. According to the Psychological Report prepared by J. Resnick, Psychological Consultant, on November 15, 1956, Allen was tested that same day by a

teacher tester, Miss M.L. Boone, and the test was administered "[t]o determine if the child should be placed in a special education class for the mentally retarded." The results showed that chronologically Allen was 7 years, 9 months, but mentally he was 5 years, and 5 months, with an IQ of 70. Miss Boone also noted that Allen was, "pleasant and cooperative. He likes the school and the children. His motor coordination was fair." She recommended that when Allen reached a chronological age of 8 years, he should be placed in a special education class for the mentally retarded.

Just over three years later on November 23, 1959, J. Resnick prepared a second psychological report based on an IQ test given to Allen that same day. According to the report, Allen was referred by R. Conley, teacher, and the purpose of the test was, "to satisfy state requirements for re-test at the end of the three years" when Allen was a chronological age of 10 years, 9 months. The test results noted a mental age of 7 years, 4 months and IQ of 68. The report also noted that "[t]he child was cooperative. He indicated that he likes his present class placement. He expressed an interest in coloring and drawing."

Dr. Swanson, Allen's expert witness, explained that the Revised Stanford Binet tests are robust and that after reviewing all of Allen's scores, the most valid scores were the Revised Stanford Binet Intelligence Tests because they met the criteria set forth by the *Green Book*, the *DSM* and *Division 33*. Dr. Swanson has administered the current Revised Stanford Binet thousands of times, although she has not administered the L Form of the Revised Stanford Binet, which was used through the 1950's. Dr. Swanson also explained that two

standard deviations below the mean is a 68 in the Form L. Allen's first score of 70 was between 1.5 and 2 standard deviations below the mean.

### B. Beta Test

The Indiana Department of Correction gave Allen a Beta test in 1967 which resulted in a score of 104. As explained by Dr. Swanson, the Beta tests visual spatial processing and abstract reasoning, but a person does not need to know how to read to take the test and therefore, it is not an acceptable score for diagnosis. Furthermore, it is a group administered test, not an individualized test and there is no certainty as to what type of Beta was administered in 1967. Dr. Heilbronner explained that the Beta is a "very antiquated test that was used to assess intellectual functioning" and that it was used a great deal with military recruits to provide a quick IQ screen based on a group administration of that test.

### C. WAIS-III

Dr. Swanson uses the WAIS. She explained that the WAIS-IV and the Stanford Binet Intelligence Scales are the "gold standards" in IQ testing. Dr. Hazelrigg also explained that the Beta scores and WAIS IQ scores are within six points of each other and therefore, if the WAIS had been given at the same time as the Beta 104 score, the score would be at the lowest in the 90's.[3]

---

[3] Dr. Swanson explained that Dr. Keyes could not emphatically say what test was given or whether it was a WAIS-III when Allen scored an 85. The year it was given the WAIS-III was being used, but Dr. Keyes did not remember if that was the test. However, Dr. Hazelrigg explained that the WAIS-III given by Dr. Keyes

### D.  Woodcock-Johnson Test

With a Woodcock-Johnson-III, two to three tests each are given in the areas of reading, writing and math and then all scores are combined to give broader scores at the top. As described by Dr. Hazelrigg in Allen's Exhibit RR, the result of Allen's Woodcock-Johnson test 11, writing samples, is that there are some errors in spelling and grammar but Allen is able to convey information correctly about the picture. For example, with the picture of the chick breaking out of an egg, Allen writes that he sees "a little bird coming out of a shell." For the picture with the girl looking in the closet he says "she is looking into the closet for a belt to hold up her clothes–her dress." According to Dr. Hazelrigg, Allen writes in cursive, conveys a concept of a simple idea, punctuates incorrectly which hurts his score, in general, capitalizes correctly and spells correctly.

### E.  Vineland and Adaptive Behavior Assessment System

As part of her review, Dr. Swanson conducted a retrospective analysis, which involves interviews and testing with a preferred informant in assessing whether Allen manifested substantial impairment of adaptive behavior. There were two retrospective tests used by Dr. Swanson, the Vineland Adaptive Behavior Scale ("VABS-II") and the

---

with a score of at least 75 is above the mental retardation threshold unless the deviation was greater than a 5. He also explained that the standard error of measurement from the WAIS-III is 2.3 so the probability of someone with an 85 scoring a 68 (5 deviations give or take) is minuscule. The court cannot hinge a decision on that score when Dr. Keyes could not state definitively whether he administered a WAIS-III, he could not remember the score of the test and the court has been provided with valid Stanford Binet results.

Adaptive Behavior Assessment System ("ABAS-II"). The retrospective testing goes back to age 16 on the ABAS-II.

A preferred informant is someone who knew the individual well for at least six months. A preferred informant needs to be able to answer all the questions on the entire scale related to hygiene, dressing, eating skills, housekeeping skills and social skills, among others. For a reliable respondent, the time the person knows a person varies. Approximately three to six months would qualify in a living environment, but it would also depend on how much a person was observed. The only living person that met the preferred informant standard was Allen's younger sister, Stokes. Stokes had knowledge and memory in all the different subdomains. The time period she used was age 16.

Stokes was given the ABAS-II to complete herself. Dr. Swanson then gave Stokes the VABS-II. Dr. Swanson explained that some things Stokes guessed on, maybe two on one form and one on the other. Dr. Swanson did not ask Stokes to score on "work" for the VABS-II because Allen only worked part-time. Stokes marked the answers and Dr. Swanson then scored the VABS-II based on information that Stokes gave her.

**F. Testimony of Mary Jo Dare**

Dr. Dare, a clinical associate professor over the special education program at Indiana University-Purdue University Indianapolis, was a special education administrator in IPS for most of her career. For sixteen years, she was the Director of Special Education and Student Services for more than 7,500 students with disabilities in addition to psychological

service, social service guidance and health services. She also oversaw pupil records, supervised principals at all three levels and was over the IPS select school process. Students with a disability must have a case conference, which is an annual assessment to determine whether the student's placement is correct. Dr. Dare explained that the forms used in the 1950's contain less review than later forms. Dr. Dare reviewed all of Allen's records that IPS must maintain by law.

Allen entered IPS in kindergarten, and he was placed in special education during second grade. Once Allen entered special education classes, he did not leave those classes. The pre-primer level was the pre-kindergarten level. This was mainly pictures working on some letter recognition i.e. picture of dog with the word "dog." Allen was at a pre-primer level until the end of second grade. Allen reached a second grade, first month level. Allen's plateau in reading ability was in 1960. Allen reached a second grade level but he did not maintain it so IPS had to drop him back to a first grade level. Dr. Dare thinks that Allen's issue was a cognitive problem at IPS not an effort problem.

With Allen's IQ of 70, at that time, he would have been placed in a self-contained classroom for those that are mentally retarded. From what Dr. Dare could tell based on the IPS records, Allen was cooperative in the testing, he participated and there is no indication that the evaluation was incorrect. The recommendation was that Allen be placed in a special education classroom for the mentally retarded. In 1959, IPS was adhering to Indiana's requirement to evaluate every 3 years to determine whether Allen was still

eligible. Allen's three year evaluation was completed on November 23, 1959. The recommendation following Allen's evaluation was that he remain in a special education class for the mentally retarded. During the 1950's, the classes were self-contained so a class for "mild mentally retarded" only included those children.

Within IPS tests were recorded on the pink card for all students if there was a test. Allen's reading level plateaued in 1960 at a 2.0-2.1 at the approximate age of 12. In respondent's Tab M, which is Dr. Dare's post-conviction affidavit, she noted that there was "difficulty processing language" based on her review of Allen's IPS records. Dr. Dare's statements were based on thousands of records she had reviewed, given Allen's profile and many years of experience in the field of special education. There was no adaptive functioning assessment completed at the time Allen was placed in a class for mental retardation. The adaptive functioning assessment was based on the IQ test and input from the teacher.

Allen did not receive any credit whatsoever in his high school classes while at Tech High School. According to Dr. Dare, Allen repeated some of the same classes, although he may have earned some credits while at the Indiana Boys' School. Dr. Dare concluded that Allen had a very solid placement in special education.

### G. Testimony of Family Members

***Marilyn Stokes***. Stokes, who is one year younger than Allen, described certain instances in which her older brother had distinct behaviors such as throwing his entire

fishing pole into the water to catch a fish when he was told to "throw out" his pole and when Allen hammered the door several times when he was told to "crack the door." Stokes remembers that when Allen was 14 and 15, he would go out and get a bag of groceries, even though Allen did not have any money. Stokes recalled that when Allen was 14, he could not tie his shoes or button his shirt correctly. Stokes recalls an incident when Allen was between the ages of 14 and 15, where, as she described, Allen would zip his private parts into his pants. Stokes also remembers that Allen was incarcerated much of his teen years.

Stokes said Allen could not read and that Allen would just look at pictures and ask his younger brother, Michael Allen, what something meant. Stokes also observed Allen seeking assistance with his homework from his younger brother. Allen would ask Michael Allen if he knew what something meant when Allen was looking at a picture on his homework.

**_Stephen Michael Allen._** Michael Allen remembers when he was around age seven when Allen was around age twelve Allen asking him how to spell "how." Around 1985-86, Michael Allen observed Allen working at Naval Avionics. Michael Allen secured the job for Allen. The job was waiting for Allen at Naval Avionics when he was released from prison. Allen was a dishwasher for about two years. There was no issue with Allen's work until he applied for a badge. Allen lost his job because he wanted a badge to get through security and Michael Allen told Allen if he applied for a badge he would likely lose his job

because of his criminal record. Nevertheless, Allen applied for a badge, was denied a badge because of his criminal history and ultimately lost his job because he did not want to go through security each time.

### H. Evaluations of Howard Allen

**Victoria Swanson.** Dr. Swanson, Allen's expert, is employed as a licensed psychologist in Louisiana and treats people with mental retardation. She presently uses the WAIS-IV and she has administered the Stanford Binet thousands of times. As the first criteria in assessing whether Allen is mentally retarded, Swanson used the *DSM*. The *DSM* diagnosis is based on the AAIDD definition in the 9th edition. There are three criteria: 1) intellectual; 2) deficits in adaptive behavior, specifying 10 to 11 areas and requiring that you must find deficits in at least two of those areas; and 3) clear evidence that the deficits in both areas were evident prior to age 18. As the second criteria, Swanson used the *Green Book*.

Dr. Swanson explained that there aren't any real tests for malingering in mental retardation, so she looks for consistency in the testing over a long period of time. Retrospectively, she compares current scores with scores back in time. Dr. Swanson interviewed Allen's two sisters, brother, and a friend of his when he was younger that is now married to his sister. The VABS-II and ABAS-II are the gold standards as far as how to administer the scale for deficits in adaptive behavior. Dr. Swanson followed the guideline.

When Dr. Swanson met with Stokes, Dr. Swanson wanted to know whether there was a specific period of time prior to age 18 that Stokes could discuss. Dr. Swanson gives two scales to one informant to get some reliability. Dr. Swanson gave Stokes the ABAS-II first. The instrument is only valid if in any area, Stokes guessed on 4 or less answers in any specific subskill. There are ten areas, so if any in any of those areas she had to guess more than four times, it would be an invalid instrument and Dr. Swanson should just do a structured interview with her. When Dr. Swanson gave it to Stokes, Dr. Swanson determined that Stokes guessed on maybe two subtests, so it qualified as a valid instrument.

In the retrospective assessment, Dr. Swanson explained that it is very clear that the analysis goes back to age 16 on the ABAS-II. The first part of the interview with Stokes was thirty minutes. Stokes was given the ABAS-II to do herself and it takes twenty to thirty minutes to complete. After that, Dr. Swanson gave Stokes the VABS-II. Some things Stokes guessed on, maybe two on one form and one on the other. Dr. Swanson scored the VABS-II. Stokes marks the answers and Dr. Swanson then marks and scores based on information Stokes gave her. Dr. Swanson asked Stokes several questions about one item and then the manual tells Dr. Swanson to assign a zero, one or two based on her answers. It normally takes Dr. Swanson about an hour to fill out that form, but in this case it was closer to thirty to forty-five minutes. Normally, VABS-II scoring may take longer, about sixty minutes.

In a retrospective diagnosis, Dr. Swanson would search to see if she can conduct

semi-structured interviews and if so, she would conduct as many as possible. All interviews conducted by Dr. Swanson were semi-structured which meets the requirements of the *Green Book*. Dr. Swanson conformed with the standard of practice from the *Green Book*.

### I. Quality of Data Used to Assess Allen

Dr. Hazelrigg, respondent's expert, is a licensed psychologist in North Carolina who is qualified to make an assessment regarding mental retardation. Dr. Hazelrigg's entire practice is related to forensic psychology in that he is evaluating people who are involved with the court system. Dr.Hazelrigg was asked by the Indiana Attorney General to review information regarding the diagnosis of mental retardation in Allen, to interpret the technical information, to assess to the best of his ability the quality of the data that was used by others in assessing Allen, to review the administration of different tests and to assess if the proper procedures were used in conducting evaluations.

Dr. Hazelrigg did not diagnose whether Allen is mentally retarded under the *DSM* or *Green Book.* Dr. Hazelrigg admits that he never met Allen, never administered tests to him and never met with Mary Jo Dare. He did not listen to the first day's testimony , meet with Allen's family members or diagnose Allen. If Dr. Hazelrigg gave a diagnosis on the day of his testimony, he admitted that would be unethical. He neither agreed nor disagreed with Dr. Swanson's assessment because he did not make his own assessment.

Dr. Hazelrigg reviewed Allen's IQ scores. From his review, Dr. Hazelrigg determined that only one score, the Stanford Binet 68, is below the threshold for calling

someone mentally retarded, that the quality of the data is variable and that some of the tests are better than others at assessing IQ. At the time the Stanford Binet tests were given, Dr. Hazelrigg admits that those tests were the best available tests for IQ. However, because the reports regarding Allen's testing were not very detailed, Dr. Hazelrigg thought it was hard to tell the circumstances of the testing and who administered them. Furthermore, Dr. Hazelrigg believes that the younger Allen was at testing, the less reliable those results will be in relation to later intelligence assessments.

Dr. Hazelrigg was asked to evaluate the existing scores and the basis of the information used up until today. He was not asked to collect or produce new information or opinions regarding Allen. He explained that analysis of what someone has done and the quality of that work is different than doing an independent, full evaluation and analysis.

## V. Discussion

### A. Methodology

Adapting the rationale found persuasive in *Atkins* to the present case yields the following: If Allen is found to be mentally retarded under Indiana law, then he may not be executed. Under *Atkins*, the Court allowed each state to develop a standard for enforcing the prohibition against executing mentally retarded individuals. *Atkins* at 317. Under Indiana law, a mentally retarded individual is someone who, "before becoming twenty-two (22) years of age, manifests: (1) significant8ly subaverage intellectual functioning; and (2) substantial impairment of adaptive behavior . . . ." IND. CODE § 35-36-9-2. Prior to the enactment of this statute, Indiana courts considered mental retardation as a mitigating factor when considering whether to sentence someone to death. The Supreme Court did

not define mental retardation in *Atkins*, but recognized the definitions set forth by the erstwhile American Association on Mental Retardation ("AAMR"), now the AAIDD as set forth in the *Green Book* and the APA as set forth in the *DSM*.

### B. Analysis

At the evidentiary hearing, Allen developed a straightforward factual basis of his mental retardation claim and presented this court with Dr. Swanson's expert opinion that Allen met Indiana's definition of mental retardation. Respondent's expert, Dr. Hazelrigg, limited his opinion to an assessment regarding the diagnosis of mental retardation in Allen, an interpretation of technical information, an evaluation of the quality of the data that was used by others in assessing Allen, a review of test administration and an assessment as to whether proper procedures were used in conducting evaluations. Dr. Hazelrigg did not provide an expert opinion on the ultimate issue of Allen's mental retardation under Indiana law. In this case, Dr. Hazelrigg does not think there is a sufficient basis to do a reliable adaptive functioning assessment.[4]

Dr. Swanson testified that Allen met the three-prong criteria for diagnosis of mental retardation based on the standards in both the *Green Book* and the *DSM*. (*See* Hearing Transcript at Vol. II, p. 81). Although Dr. Hazelrigg did not conduct an individual assessment of Allen, he challenged Dr. Swanson's findings, based on his conclusion that only one of Allen's scores is below the threshold for calling someone mentally retarded,

---

[4] Dr. Hazelrigg neither agreed nor disagreed with Dr. Swanson's assessment because he did not make an independent assessment. Dr. Hazelrigg admits that had he conducted an independent evaluation, he may have reached the conclusion that Allen is mentally retarded under Indiana law.

that the quality of the data is variable and that the younger the age in relation to the testing, the less reliable the results. In assessing the experts' respective conclusions, the court will individually assess each prong of mental retardation as defined under Indiana law.

*Significantly subaverage intellectual functioning.* Significant subaverage intellectual functioning, means approximately two standard deviations below the mean. More specifically, the intellectual functioning cutoff criteria for establishing the boundaries of mental retardation is "[a]pproximately two standard deviations below the mean, considering the standard error of measurement for the specific assessment instruments used and the instruments' strengths and limitations." *Green Book* at p. 10 (citing the *AAMR Manual* at p. 58 (2002)). Dr. Swanson's opinion is that Allen meets the DSM intellectual criteria for a diagnosis of mental retardation. Her reasons are that there is proof prior to Allen turning 18 that the individually administered Stanford Binet Form L tests resulted in scores of 68 and 70. In her field of practice, those are accepted scores for mental retardation.[5] In 1956, the 70 score was when Allen was 7 yrs, 9 months, and in 1959, the

---

[5] The Indiana Supreme Court has explained accepted scores in Indiana:

In determining what qualifies as "significantly subaverage intellectual functioning" we have made reference to the works of the American Association on Mental Retardation and the American Psychiatric Association. *Woods v. State,* 863 N.E.2d 301, 304 (Ind.2007) (citing *Atkins,* 536 U.S. at 308 n. 3, 122 S.Ct. 2242). "Under these descriptions, a person is considered to meet the subaverage intellectual functioning component if the person's full-scale IQ test score is two standard deviations below the mean; i.e., an IQ between 70 and 75 or lower." *Id.; see also Williams v. State,* 793 N.E.2d 1019, 1028 (Ind.2003) (quoting *Atkins,* 536 U.S. at 309 n. 5, 122 S.Ct. 2242) (" 'An IQ between 70 and 75 or lower, ... is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition.' ").

*State v. McManus,* 868 N.E.2d 778, 785 (Ind. 2007); *see Witt v. State,* 938 N.E.2d 1193, 1199 (Ind.Ct.App. 2010).

score of 68 was when Allen was 10 yrs, 11 months. These scores are the most valid because they met criteria in the AAIDD, the *Greenbook*, the DSM and the Division 33 requirements. Dr. Hazelrigg admitted that a score of 68 on the Stanford Binet L is consistent with a mental retardation diagnosis and that a full-scale IQ of 70 at age seven on a Stanford Binet could be consistent with mental retardation under some circumstances, depending largely on an adaptive skills assessment at that time. Based on Allen's Stanford Binet score in 1956, the recommendation was made that when he reached a chronological age of 8 years, he should be placed in a special education class for the mentally retarded.

Dr. Hazelrigg asserted that only the 1959 Stanford Binet score of 68 is below the threshold for calling someone mentally retarded. However, of the tests administered, the Stanford Binet intelligence tests are the most reliable[6] and there is nothing in the record demonstrating that the Stanford Binet tests given to Allen were improperly administered. Accordingly, the court accepts these scores as valid IQ tests.

Allen entered IPS special education during second grade. He remained in special education while at IPS. Allen was at a pre-kindergarten level until the end of second grade. Allen did not maintain the second grade level so IPS had to drop him back to a first grade level. Dr. Dare believes that Allen's issue was a cognitive problem not an effort problem. Within IPS, Allen's reading level plateaued in 1960 at a 2.0-2.1 at the approximate age of 12. In respondent's Tab M, which is Dr. Dare's post-conviction affidavit, she noted that

---

[6] Dr. Keyes could not substantiate the 85 test result, so a mental retardation diagnosis cannot hinge on that score. Dr. Keyes explained that he believes Allen scored in the "high seventies, low eighties" and that "he is absolutely certain the full scale score could not have been 85." He admitted that this was based on memory and that the test scores are lost. (Dep. 40).

there was "difficulty processing language" based on her review of Allen's IPS records. Dr. Dare's statements were based on thousands of records she had reviewed, given Allen's profile and her many years of experience in the field of special education.

Based on Allen's Stanford Binet IQ test scores of 68 and 70 and his solid placement in special education classes during his childhood, Allen has demonstrated by a preponderence of the evidence that he suffers from significantly sub-average intellectual functioning.

*Substantial impairment of adaptive behavior.* The Indiana mental retardation statute requires in part, a person who manifests substantial impairment of adaptive behavior. Ind.Code § 35-36-9-2. As clinically defined by the AAIDD and the APA, adaptive skills include communication, functional academics, use of community resources and work. *See Atkins* at 318 (adaptive skills include communication, self-care and self-direction). The adaptive behavior cutoff criteria as defined is "[p]erformance that is at least two standard deviations below the mean of either (a) one of the following three types of adaptive behavior:conceptual, social, or practical or (b) an overall score on a standardized measure of conceptual, social, and practical skills." *Green Book* at p. 10 (citing *AAMR Manual* at p. 76 (2002). Allen references Dr. Swanson's conclusions to support his claim that he manifests a substantial impairment of adaptive behavior.[7]

In assessing adaptive behavior under a "retrospective assessment" a psychologist

---

[7] The Indiana statute requires that the criteria for mental retardation are satisfied before age 22 but the *Green Book* says before age 18, so Dr. Swanson evaluated this area before age 18. Dr. Swanson's assessment of this criteria was derived from the standardized scores on the adaptive tests, information from Allen's records and information from the interview.

is asked to assess how someone was at a previous time for various reasons. In this case, under *Atkins*, Dr. Swanson looked at Allen before the crime, prior to age 18, to determine if he satisfies the criteria for mental retardation. This type of assessment is difficult because it requires going back in time to see if the person meets the criteria for substantial impairment of adaptive behavior. Dr. Swanson acknowledged the ability to conduct a retrospective diagnosis in determining whether someone is eligible for the death penalty and did these prior to the *Atkins* decision.[8]

On Allen's ABAS-II computer score sheet, in the raw score to scaled score conversions, the scaled score mean is ten and the standard deviation is three. (*See* Exhibit 16). According to Dr. Swanson, any score of four or less would indicate that at 16 years, Allen had significant deficits in that area. Allen scored a 4 in communication, community use and leisure and a 3 in functional academics. In the sum of scaled scores to composite score conversions, there are three composites, conceptual, social and practical. On the conceptual composite, Allen scored a 69 which is "extremely low" in the qualitative range

---

[8] Dr. Hazelrigg stated there was no adequate foundation to assess Allen's adaptive skill domains. According to Dr. Hazelrigg, the proper procedure for assessing adaptive skills is to have an individual that you can observe directly, reliable informants who know the individual well and can answer questions accurately, completely and objectively. Dr. Hazelrigg's problems with conducting an assessment on Allen is that there are no tests for adaptive skills while incarcerated and family members are not familiar with his current level of functioning, so a retrospective analysis is difficult. He reviewed Dr. Swanson's reports-petitioner's exhibits 12 and 13. Stokes gave information from when she was 12 or 13. Stokes may remember specific questions, but a day to day lifestyle is hard to remember for someone from 40 years ago. The tests requires the use of adult respondents and Dr. Hazelrigg does not think that Stokes does not meet the requirement for that from a time when she was 12 or 13. Although Stokes was asked to recall examples from 40 years ago, she provided the court with concrete examples of Allen's level of functioning directly related to his adaptive skills. Furthermore, the Indiana mental retardation statute requires substantial impairment of adaptive behavior before age 22, so  assessment of Allen's adaptive skills during that period of his life is more critical than the adaptive probes Dr. Swanson conducted directly with Allen while incarcerated.

and in the social and practical areas he scored 72 and 75, which is "borderline" overall. (*See* Exhibit 16). The General Adaptive Composite score of 64 and the conceptual composite of 69 from the ABAS-II met the *Green Book* criteria for substantial impairment of adaptive behavior.

Dr. Swanson also interviewed Stokes in an structured interview format for the VABS-II. Stokes disclosed a number of hurdles Allen encountered during his childhood. Stokes remembers that Allen always had problems telling time and that Allen's special education teacher made a "pipe cleaner" clock[9] for him. Allen's mom and sisters worked with Allen to teach him time on the pipe cleaner clock, but he never learned. Allen never comprehended that quarter after was fifteen or that 45 was a quarter until the hour. At age 16, Allen could not tie shoes and get himself dressed. He did not learn to ride a bike until he was in high school. His clothes were laid out for him by his mother even when he was 16. He could find his way in his immediate neighborhood where they had always lived, but if he left the neighborhood, someone had to go with him. He could take the bus to a specific place and find the movie theater. Friends and relatives helped Allen fill out job applications and secure jobs.

On the VABS-II some scores were above two standard deviations below the mean of 100. On the VABS-II, for daily skills Allen scored a 71, for socialization he scored a 76 and for motor skills he scored a 100, which is average. However, his communication score

---

[9] There was a little confusion about the name of this device. It was sometimes referred to as a "pipe" clock and then other times as a "pie" clock. It sounded like a device that, in the pre-digital age, would be crafted by teachers and students, using the drawing of a clock face, with pipe cleaners as the hands. This entry will use the term "pipe cleaner" clock to describe the device.

was 63 and his adaptive behavior composite, which is the standard overall score, was a 68. Allen's VABS-II adaptive behavior composite score of 68 and ABAS-II scores of 64 are consistent. There are only four points difference between the two scores even though they were administered in two different ways. The lower scores are in Allen's conceptual communication with higher scores achieved in the practical and the social areas.

Dr. Swanson's evaluations indicate that Allen met the criteria for adaptive deficit areas prior to age 18 in the areas of communication, functional academics use of community resources and work. These adaptive deficit areas are set forth below with specific examples of why Allen met the criteria for each of these adaptive deficit areas.

*Communication*

In relation to the communication deficit, Stokes explained that Allen was quiet, did not spontaneously start a conversation and he took what was said to him literally. He needed issues in concrete terms. When issues were not clear to him he responded by for example, tossing his entire fishing pole into the water to catch a fish when he was told to "throw out" his pole and hammering the door several times when he was told to "crack the door." On the ABAS-II, Allen's scaled score in communication was a 4 and on the VABS-II, his standardized score in the area of communication was a 63, which indicates that at 16 years, Allen had significant deficits in the area of communication. Dr. Swanson concluded that Allen has communication deficits including reception, comprehension and language expression.

*Functional Academics*

Swanson secured Allen's functional academic information through review of Allen's records, individual work with Allen, the individual probes and the Woodcock-Johnson observations. Allen plateaued at the third to fourth grade level. Allen's functional academics were documented at least two other times by those other than Dr. Swanson.[10]

With the pipe cleaner clock from special education classes, Allen had difficulty telling time when he began trying at ages 12-13, and still could not do it at 16. The pipe cleaner clock was initially discussed at an informal interview. Stokes said Allen could not read and that Allen would just look at pictures and ask his younger brother what something meant. Stokes also observed Allen seeking assistance with his homework from his younger brother, Michael Allen. Allen would ask Michael Allen if he knew what that meant when Allen was looking at a picture on his homework.

The Woodcock-Johnson-III was also used by Dr. Swanson on Allen, with results set forth in Exhibit 14. When Allen completed the Woodcock-Johnson-III, Dr. Swanson used the score itself and also observed how Allen writes, reads and does his math (i.e. on fingers). The section of the Woodcock-Johnson-III set forth in Exhibit 15 includes the sample items from Test 8, writing fluency, which tests how well a person can write something that is easy to write (i.e. picture of pig with words "pig" "fat" "is"). The four examples took Allen almost seven minutes, but they should have taken him a maximum of one to two minutes. These were learning examples you give before administering a test.

---

[10]Dr. Swanson explained that the Wide Range Achievement Test ("WRAT") screening instrument done by Dr. Heilbronner showed Allen at the third to fourth grade level in all academic areas. The WRAT-III was administered prior to Dr. Swanson seeing Allen in 1999. When Dr. Swanson administered the Woodcock-Johnson-III, Allen scored at the fourth to fifth grade level.

Dr. Swanson stopped after the four examples and did not administer the test Dr. Swanson explained that Allen can write, but it takes him much longer than it should to write a few simple sentences. The fact that Allen can use cursive does not suggest that he is not mentally retarded.

Allen's Woodcock-Johnson scores are between the third grade level and sixth grade level. There are only four of the scores at the third grade level or lower. In petitioner's Exhibit 15, test 8 of the Woodcock-Johnson, Allen's score on test 11 was that of a fourth grade, fourth month level. It took Allen a long time to complete, but it is not timed. In Dr. Swanson's informal interview with Allen, he indicated that things became hard for him when he had to learn to do division. Dr. Swanson explained that by definition someone is not mentally retarded solely because he does not know how to read.

As set forth in the Joint Stipulations 2, page 4, the letter shows Allen has good copying skills, that he could write, that he could fairly well follow a topic and that something happened because there was not enough supervision. This is an example of written expression and abstract thought. As explained by Dr. Hazelrigg, the letter that Allen had help from Chris Peterson, Allen gives the date, he explains the situation, he conveys thoughts and it is a pretty clear communication. Dr. Hazelrigg thought the letter was remarkable in that in the final lines Allen wants to open the line of communication, which Dr. Hazelrigg sees as a higher level of social skills and a level of abstraction than is inconsistent with someone who is very impaired. It is not an extremely high level, but he is saying let's open the line of communication because that is what they say is lacking. Most

of the DOC documents are requests for medical treatment. Dr. Hazelrigg's impression from the writings are that Allen knows the dosages and if he anticipated running out of medications, he asked for refills before they ran out, for example, and he was pretty clear as to know what he should have been taking for his medical conditions.

Dr. Swanson explained that you cannot assess adaptive functions in prison systems but Dr. Swanson still likes to do adaptive probes. She tested Allen's ability to use a phone book by giving him the name "Clay Allen." Allen did not go to his surname and instead went to "C" to look up the first name. He also went to the residential pages when trying to find a plumber and looked under "p." She had Allen use a dictionary. It took Allen anywhere from 30 seconds to 3 minutes to find a word in the dictionary. Allen also knew of no way of measuring time. When Dr. Swanson gave Allen an 8.5 x 11 piece of paper to measure, Allen did not know where to start to measure-where to put the measuring tape. He could tell 1/4 and 1/2 inch but he could not measure. Allen cannot make change and he cannot read a map or find something by an address. Allen's math was consistent with a third to fourth grade level. Allen could add and subtract but he could not do division, fractions or percentages. Allen could read approximately 112 site words per minute which is considered appropriate or low average for a third grader. She explained that when you lose reading fluency you also lose comprehension. Allen's comprehension fell to 50%. Allen's challenge is his comprehension because he barely passed; he would answer seven out of ten questions about a very simple story on very easy words.

Although Dr. Hazelrigg agrees that a second grade, first month reading level at a

chronological age of 13 is consistent with mental retardation, it is not specific to or diagnostic of (mental retardation) in and of itself. There are lots of reasons why people can have trouble reading, but someone with mental retardation could have that profile. He agrees that a fifth grade reading level as an adult is consistent with mental retardation. Dr. Hazelrigg admits that the inability as an adult to count money, use a phone book, look up something in the dictionary, use a ruler, a measuring tape or do basic measurements or the index in a newspaper is consistent with mental retardation. He also admits that a person with mental retardation can hold a job, get married, have friends and commit crimes and that a strength in one area does not negate mental retardation.

Overall, Allen's skills were at the fourth grade, seven month level. His overall reading combined approximates the fifth grade, zero month level and his math is at the fourth grade, third month level. The scores are not typical of someone over 60 yrs of age. The scores are consistent with the scores that are reported throughout Allen's records and they are consistent with Dr. Swanson' final inquiry when she sat down and directly worked with Allen on the adaptive probes. Allen's functional academics score is consistent with what the DSM outlines in the range which is typically a sixth grade level or less.

*Use of community resources*

"Community use" is a person's ability to find his way around the community commensurate with chronological age. In the ABAS-II test administered to Stokes and as reflected in the ABAS-II summary in Allen's exhibit 16, Allen had problems finding places, following directions and using both phone books and dictionaries. He traveled by

landmarks. He had to be taught how to catch a bus and there was one bus that he knew. If he caught it, he could get to the Circle in downtown Indianapolis and from there he could find specific places. However, if he had to go somewhere else, friends would go to show him the way. Allen was deficient as a child, based on assessments and what is expected for child to get around in his community. Allen took more supports in the area of community use than others his age according to Stokes, family friend and neighbor Michael Goliday and Michael Allen. Specific items are how independently a person can move about in community. The age expectations at 6, 10 and 16 differ as they are age related.

Stephen Allen and Michael Goliday commented to Dr. Swanson on Allen's ability to use community resources during late adolescence and from ages 18 until 22. Any forms Allen had to fill out, he would ask a family member to fill it out. Informal probes were used to retrospectively determine how Allen functioned in the community at age 16. Allen learned to use a dictionary in prison and he was able to look up words for Dr. Swanson. Dr. Swanson said Allen had never used a map before and did not know how to use one.

Dr. Hazelrigg's impressions about Swanson's informal probes of Allen are that they are problematic because although the process is fine generally speaking, the problem is with the relevance of the items being asked of Allen while he was isolated from society for the vast majority of his adult life. For example, while Allen is incarcerated, he does not need a map to get around prison and he does not need a map to go anywhere else. Similarly, it was not surprising to Dr. Hazelrigg that Allen did not do well using the yellow

pages. Although those types of questions are reasonable in general, they do not apply to Allen's situation. Allen's familiarity with a map or yellow pages would be limited to when he was not incarcerated. However, even if the informal probes are problematic because Allen is incarcerated, Allen demonstrated substantial impairment of adaptive behavior in the area of community resources prior to age 22 as required under the Indiana mental retardation statute. Furthermore, under the criteria, Allen is only required to manifest substantial impairment of adaptive behavior in two areas, and as set forth above and below, Allen satisfied the criteria in the areas of functional academics, communication and work.

*Work*

Allen relied on his uncle, brother and friend to find his four major jobs and he relied on family members to complete job applications. According to Dr. Swanson, Stokes said that most of Allen's jobs were day work. Michael Allen secured a job at Naval Avionics for Allen. The job was waiting for Allen when he was released from prison. Allen was a dish scraper for approximately two years. Michael Allen described the dish scraper position as a very menial job. Allen had the Naval Avionics job for about two years and that was the longest job he had.

Allen had the car wash job about two months at the time he was arrested for the murder of Ernestine Griffin. His nephew secured him a job in construction. His uncle also secured a job for him. Stokes reported that Allen's work was always temporary and work that someone else always helped him find. For these reasons, Allen showed a substantial

impairment of adaptive behavior in the area of work.

*Other Adaptive Deficit Areas* In addition to satisfying the adaptive deficit areas set forth above, as far as self-care, Stokes recalled that when Allen was 14, he could not tie his shoes or button his shirt correctly and he would zip his private parts into his pants. Stokes remembers that when Allen was 14 and 15, he would go get a bag of groceries, even though Allen did not have any money. Michael Allen explained that Allen always wore slip on shoes or velcro shoes. Furthermore, he usually saw Allen with his shirt flapping, with it always buttoned wrong or not buttoned at all. Allen did not learn to ride bike until after his younger brother knew how to do it.

*Manifested by age 22.* Allen's Stanford Binet scores of 68 and 70 were both scored during Allen's childhood. Allen met the criteria for adaptive deficit areas prior to age 18 in the areas of communication, functional academics, use of community resources and work. Furthermore, after age 18, he continued to meet the adaptive deficit areas in the areas of communication, functional academics and work. Based on the criteria in the *Green Book*, Allen satisfies the diagnosis for mental retardation. Under both the DSM and the *Green Book*, Allen has shown by a preponderance of the evidence that he satisfies the Indiana definition of mental retardation.

## VI. Conclusion

As the discussion of the record evidence demonstrates, Allen has shown by a preponderance of the evidence that he meets the three prong criteria for diagnosis of mental retardation by the standards set forth in both the DSM and the *Green Book*.

"A straightforward application of *Atkins* to the facts of this case entitles Allen to a hearing regarding whether he is mentally retarded and therefore categorically excluded from the death penalty." *Allen*, 558 F.3d at 665. That hearing having been conducted, and all of the evidentiary submissions and arguments having been carefully considered, it is determined that Allen satisfies Indiana's definition of mentally retardation, and therefore, Allen's sentence violates the prohibition of executing mentally retarded individuals under *Atkins v. Virginia*, 536 U.S. 304 (2002). Through a separate judgment, Allen's petition for a writ of habeas corpus will be granted with respect to the nature of his sentence and the State of Indiana will be directed to vacate Allen's death sentence and re-sentence him to an available sentence under Indiana law, excluding death, within 180 days of this Order. Petitioner shall recover his court costs not already authorized and shall have 21 days to seek recovery of such costs.

**IT IS SO ORDERED.**

_____

John Daniel Tinder, Judge
Sitting by Designation

Date: 7/3/2012
_____